## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARK BEERNTSEN and BEERNTSEN CANDIES, INC.,

       Plaintiffs,

    v.                                    Case No. 11-C-151

BEERNTSEN'S CONFECTIONARY, INC. and
ACUITY, A MUTUAL INSURANCE COMPANY,

       Defendants.

---

### DECISION AND ORDER

---

Green Bay-based Beerntsen Candies, Inc. ("Green Bay Beerntsen") and its owner, Mark Beerntsen, brought this action against Beerntsen's Confectionary, Inc., ("Manitowoc Beerntsen"), a Manitowoc store, alleging claims relating to trademark infringement and breach of contract. Both sides have now moved for partial summary judgment. For the reasons that follow, Manitowoc Beerntsen's motion will be granted and Green Bay Beerntsen's denied.

## I. Background

Henry Beerntsen founded the Green Bay Beerntsen candy shop in 1925 and, in 1960, he sold the business to his son Melvin. In 1981, Melvin applied to register the Beerntsen Candies name as a trademark with the Wisconsin Secretary of State. In 2001, Melvin sold the business to his son Mark. The business has been selling chocolate and other candy continuously since 1925 through its store in Green Bay as well as its internet website and other outlets.

Henry Beerntsen's brother Joseph also found himself in the candy business. Joseph worked at a number of different candy factories and stores, including a Milwaukee company called "Jos.

A. Beerntsen Chocolates," until he founded his store in Manitowoc, some 35 miles from Green Bay, in 1932. The Manitowoc store followed a similar path of fathers selling to sons. In 1958 the business was sold to Joseph's son, Richard, and in 1984 Richard sold the store to his son Tom. During the early decades, the two companies sometimes worked together by buying product in bulk and sharing ideas, and the Green Bay store often bought the Manitowoc store's products for resale.

In 1984 the first signs of trouble emerged between the cousins. The Manitowoc Beerntsen's announced plans to open a store in Cedarburg, some seventy miles to the south. Melvin, of the Green Bay store, objected and threatened to sue. In 1985 a settlement was reached in the form of a concurrent use agreement. In short, the agreement provided that Tom would use the Beerntsen name in Manitowoc County and the two counties to the south (Sheboygan and Ozaukee), and he could operate two other stores in the state so long as they were 100 miles from the Brown County line. These "territories" also applied to products intended for resale, such as those sold to hotels or resorts. The agreement had a term of 25 years. In 2003, while the agreement was still in effect, the Manitowoc Beerntsen's sold its assets to Schadrie Chocolates, Inc. Among the assets were the goodwill of the business (particularly the Beerntsen name) and the website beerntsens.com, which the Manitowoc store had been operating for some time. In 2011, Green Bay Beerntsen's brought this lawsuit alleging trademark infringement and breach of the concurrent use agreement.

## II. Analysis

## A. Trademark Infringement

Plaintiffs bring their trademark infringement claims under both the Lanham Act, 15 U.S.C. § 1125(a) and state common law. In order to prevail on these claims, a plaintiff must demonstrate that it has a protectable trademark and that the defendant's use of the mark is likely to cause

2

confusion among consumers. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir. 2002); *Madison Reprographics, Inc. v. Cook's Reprographics, Inc.,* 203 Wis.2d 226, 552 N.W.2d 440 (Wis. Ct. App. 1996).

**1. Protectable Interest in the Trademark**: **Need to Show Secondary Meaning**

"Marks that are primarily merely surnames' constitute a specific subcategory of descriptive marks." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir.1999). In fact, under 15 U.S.C. § 1052(e)(4), a mark that is "primarily merely a surname" may be denied federal trademark registration. Even so, a surname can become a protected trademark if it acquires a secondary meaning, i.e., if the name has become distinctive of the plaintiff's goods in commerce.

"Supposing a man named Brooks opened a clothing store under his name, should this prevent a second Brooks from opening a clothing store under his own (identical) name even though consumers did not yet associate the name with the first Brooks's store? It should not." *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 989 (7th Cir. 2004). By contrast, if a man named McDonald wanted to open a fast-food restaurant today, he would be hard-pressed to do so under his own name because the consuming public has already associated the name with the original company's business.

Plaintiff first argues that it does *not* need to show secondary meaning in this case. It concedes that the general rule requires a showing of secondary meaning to establish a protectable trademark in a surname, but it relies on *Peaceable Planet*'s holding that the plaintiff in that case was not required to show a secondary meaning. It is true that the *Peaceable Planet* court found the general rule requiring secondary meaning to be inapplicable in that case, but the case is an outlier given the unusual facts presented there. First, the *Peaceable Planet* case involved a first name rather than a surname, and the court noted that the statutory bar on names applied only to surnames.

3

More importantly, the court in *Peaceable Planet* was faced with what appeared to be a blatant effort to manipulate the competitive market. A large toy company, Ty Inc. (maker of Beanie Babies), came out with a toy camel named "Niles" only a year after a much smaller competitor introduced a camel with the same name. Presumably, there was no reason for Ty to name its camel "Niles" (a very uncommon name that has nothing to do with camels) except that its competitor had chosen that name a year earlier. The intent was to "reverse pass-off" its product and thus dilute, destroy or wholly appropriate any toy camel market the smaller competitor had created. As such, the Seventh Circuit sensibly found that the plaintiff should not have to show a secondary meaning because, "[w]hen none of the purposes that animate the 'personal name' rule is present, and application of the 'rule' [requiring a showing of secondary meaning] would impede rather than promote competition and consumer welfare, an exception should be recognized." *Id.* at 990. The Court noted that "making Ty use a different name for its camel would not deprive the consumer of valuable information about Ty or its camel." *Id.* at 991. That is, Ty's use of the name "Niles" did not convey any useful information to the consumer about that camel.

Green Bay Beerntsen's argues that these same considerations apply here. It appears to concede that if the Beerntsen cousins still owned the Manitowoc store, things might be different because consumers would be entitled to know that the owners of the store were named Beerntsen. The store's name would convey useful information to the public about the owners of the store. But because the Beerntsen name was acquired by a non-Beerntsen, the name on the window no longer conveys that potentially useful information, just as Ty Inc.'s use of the name "Niles" did not convey useful information about a toy camel to a consumer.

As suggested earlier, however, the "reverse passing-off" scenario in *Peaceable Planet* is a far cry from the situation we have here, where two longstanding businesses have independently

4

been using the same name for some eighty years. It would be one thing if the Defendant had *recently* opened a store named Beerntsen's in an effort to pass off his products as coming from the Green Bay company, thereby appropriating the Green Bay store's goodwill. (Such a thing occurred in the 1980's when another Beerntsen decided to open a store in Oshkosh.) But here, each party has an independent and legitimate right to use the name, regardless of the fact that a Beerntsen no longer owns the Manitowoc entity. The Manitowoc Beerntsen's has provided substantial evidence of its own corporate identity and history, including newspaper articles describing the store as a popular destination for both locals and tourists on their way to Door County. In 1956 a large, favorable three-page spread appeared in the *Milwaukee Journal* with pictures of three generations of Manitowoc Beerntsens making candy. (Dkt. # 49-11.) More recently, a *Money* magazine article described the "timeless air of conviviality" found at Manitowoc Beerntsen's and noted Beerntsen's role in the community. (Dkt. # 49-14.) No doubt countless locals in Manitowoc have a substantial and longstanding relationship with the Manitowoc store. Importantly, their continued patronage presumably has much less to do with the DNA of the business's owners than with the taste of the company's product. *815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.* 842 F.2d 643, 648 (2d Cir. 1988) ("[T]he consumer's perception of the meaning of the trade name is more important than the roster of corporate personnel. To the buying public, the name 'Fay's Leader' conveys the same descriptive impression, whether or not there is—or ever was—a real Fay.") Just as a McDonald's restaurant is not owned by anyone named McDonald, the Beerntsen's name conveys the useful information to the public that this candy store is the same one that has been operating in Manitowoc since the Great Depression, and consumers are entitled to draw various conclusions from that fact. For example, they could reasonably assume that the candy will taste the same, that the recipes are the same, and the like; in short, the Beerntsen name conveys to consumers that when they walk into

the store the cordial cherries or peanut brittle they've been eating since childhood will be available under the glass. Prohibiting the store from using the name it has used for eighty years would thus *harm* competition and confuse consumers more than it would help. Accordingly, I find the *Peaceable Planet* case wholly inapplicable here and conclude that the Plaintiff must show that its Beerntsen name has acquired a secondary meaning.

## 2. Secondary Meaning is Absent

As noted earlier, family names are descriptive marks and thus not entitled to protection unless they have acquired secondary meaning, or an association in the public's mind with their product. In order to acquire a secondary meaning, the public must associate the plaintiff's name *exclusively* or at least primarily with the plaintiff's product. "There is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party, for it is undesirable that such a quantity be deceived even if some, relatively small, number is not." *President and Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d 804, 807 (1st. Cir. 1975); *Coca–Cola Co. v. Koke Co.,* 254 U.S. 143, 146 (1920) (attitude of the consuming public toward the mark denotes "a single thing coming from a single source.")

Here, Plaintiff provides substantial evidence documenting its long history as a candymaker, which is not disputed. The problem is that the Defendant has an equally impressive and longstanding footprint in the candy market as well. No doubt there are a number of consumers, especially in the Green Bay area, who associate the Beerntsen's name exclusively with the Green Bay store. But there are also a large quantity of consumers who would make a similar association with the Manitowoc store (and now the Cedarburg store). In addition, just as there are undoubtedly some consumers who are confused about the relationship between the two companies, there are a number of consumers who do know that there are *two* Beerntsen's companies and that the stores are

6

not related. The Plaintiff compares its case to the *E&J Gallo* case, but that is a reach. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992). There, the court found that the well-known Gallo family name had acquired a secondary meaning through the winery's "long, continued use of the mark, the mark's widespread, national public recognition, and the Winery's extensive and expensive advertising and promotion of products bearing the mark." *Id.* Thus, when a Gallo family member attempted to enter the cheese and meat business in the 1980's, decades after the Gallo brand had become famous, he was not allowed to use the Gallo name.

Here, no one disputes that the Green Bay Beerntsen's name has a long history in the business, that it has advertised under that name and built up substantial goodwill as a result. But it has not pointed to a case, or even a rationale, supporting the finding of secondary meaning when there are essentially *two* companies that have operated in similar fashion for nearly the same period of time. Both stores have been advertising significantly and have built substantial goodwill in their own brands. In short, Green Bay Beerntsen's cannot show that a majority of the public associates the name exclusively with the Green Bay store rather than the Manitowoc store.

Moreover, secondary meaning must be established *prior* to another's use of a similar name. *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 596 (6th Cir. 1989); *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir. 1980) ("Even if Saratoga Vichy has rights in the name 'Saratoga' because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired.") "Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir. 1978). Accordingly, to

7

enjoin the Defendant's use of the Beerntsen's name, Plaintiff would have to show that its own use

of the name had acquired secondary meaning in the 1920's, and that is something it clearly cannot

do. Instead, the undisputed evidence shows that the two families operated their business amicably

and with full knowledge of each other's existence for more than a half-century. Neither family

believed it owned some sort of exclusive right to the name, and it apparently never occurred to the

original Green Bay Beerntsens that the Manitowoc store was infringing its trademark. In sum, if

there is no secondary meaning today, after decades of goodwill and advertising, it is even more of

a reach to suggest that there was a secondary meaning before the Manitowoc store began using the

name in 1932. Plaintiff's federal claim therefore fails. And since the criteria for determining

whether a plaintiff has established secondary meaning are the same under state law as they are under

federal law, *Madison Reprographics, Inc. v. Cook's Reprographics, Inc.*, 203 Wis. 2d 226, 235-36,

552 N.W.2d 440 (Ct. App. 1996), Plaintiff's state claim for trademark infringement fails also.

**3. Consumer Confusion**

Because there is no protectable trademark here, I need not address the question of consumer

confusion. Even so, for completeness it is worth remarking that the Plaintiffs' evidence of

confusion would be insufficient even if I found an actionable trademark interest. Plaintiffs have

provided evidence that on some isolated occasions people have asked whether the two stores are

related or have mistaken one store for the other. That there is some amount of confusion is not

surprising, given the identical names and the relatively short distance between the two stores.

But there is no evidence that the confusion is anything more than isolated vague

misunderstandings. Plaintiffs have not shown that the confusion is widespread, and in addition they

have not shown that consumers would even attribute much significance to the difference in the two

companies' origins. It is worth noting that in actuality it is possible or even likely that the

Manitowoc store's existence *helps* the Green Bay store because each Beerntsen business generates goodwill for the Beerntsen name. (This is one reason the franchise model works: independently owned stores operate independently while benefitting from the goodwill generated by shared name recognition.) Although most of the goodwill generated will flow to the source, to the extent there is any consumer confusion there could actually be a residual *benefit* to the other store. In short, far more people in eastern Wisconsin associate the name Beerntsen with candy than would be the case if only one of the two stores were in business. That there may be some generic sense of consumer confusion about the ownership of the two entities is of little moment, because it is doubtful that consumers care about the genealogy of the store's owners or the identity of the corporation that owns the store. No one has credibly suggested that Manitowoc Beerntsen's is passing off inferior product that will harm the Green Bay store's reputation; instead, the only confusion has to do with corporate ownership, and thus it is difficult to see how any confusion that might exist results in any harm.

**4. Remaining State Law Claim**

Plaintiffs also bring a claim for breach of the concurrent use agreement. They assert that during the agreement the Manitowoc Beerntsen's was actively selling products in violation of the agreement. Although Plaintiffs seek summary judgment as to liability, they concede that a trial on damages will be required. Defendant contends Plaintiff has failed to establish that it is entitled to summary judgment even on liability.

A district court ordinarily should relinquish jurisdiction over supplemental state-law claims if all federal claims are dismissed before trial. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.,* 578 F.3d 505, 514 (7th Cir. 2009). In some cases, the answer to a state law question is relatively straightforward, and in such a case a federal court should retain jurisdiction to resolve the question,

particularly if the claim has been thoroughly developed. Here, the state law claim has not been

developed at any length, and so no judicial economy is achieved by keeping the claims in this Court.

Nor is there any significant inconvenience to either side if they must try the contract claim in state

court. All parties concede that a trial would be necessary to resolve the claim. I thus conclude that

the general rule favoring relinquishment of the state law claims is appropriately applied here.


**III.  Conclusion**

For the reasons given above, the trademark claims are **DISMISSED** with prejudice. The

remaining state law contract claim will be **DISMISSED** without prejudice. The motion to strike

the proposed findings filed in reply is **DENIED**. The motion to designate an expert for damages

is **DENIED** as moot.

**SO ORDERED** this   24th   day of May, 2012.


   s/ William C. Griesbach
William C. Griesbach
United States District Judge